EDGAR J. TATUM v. CHARLES M. TORSON and THOMAS M. TORSON, Doing Business under Firm Name of TORSON CONSTRUCTION COMPANY, and ROBERT CARSON, Appellants.—36 S. W. (2d) 939.

Division Two, March 25, 1931.

*Langworthy, Spencer & Terrell* and *Lathrop, Crane, Reynolds, Sawyer & Mersereau* for appellants.

*Atwood, Wickersham, Hill & Chilcott* for respondent.

DAVIS, C.—This is an action for damages for personal injuries. The jury returned a verdict for $15,000 in favor of plaintiff, and from the judgment entered on the verdict defendants appealed.

The petition averred that plaintiff was employed as an operator of a concrete mixing machine, and that while operating it the brake refused to hold, thereby causing a cable attached thereto to whip about and injure him, due to the clutch and brake on said machine being out of repair, insufficient and not in a proper and safe condition and shape for the use and purpose for which it was intended; that defendants negligently ordered and directed plaintiff to use said mixer in said condition; and that defendants negligently assured plaintiff that said mixer was safe for him to operate. The amended answer of defendants was a general denial and pleas of contributory negligence.

The facts adduced on behalf of plaintiff warrant the finding that, on December 12, 1925, plaintiff was in the employ of Charles M. and Thomas M. Torson, a copartnership, then engaged as contractors in the construction of the Blue Valley sewer in Kansas City, called the Goose Neck sewer by the witnesses. The construction work on the sewer commenced in August. About October 1, 1925, plaintiff accepted and entered their employ, and so continued until injured. On December 12, 1925, he arrived at their office about seven A. M.

and was ordered by Charles Torson to operate the mixing machine in question. Robert Carson was the foreman, and plaintiff worked under his orders. Plaintiff first looked over the machine to see that it had gas and water and to determine whether the engine and parts needed oil. He started the mixing drum and was told by Carson to shut the machine down, that it was all right, on which statement he relied. Carson said it was making too much noise. During the succeeding interval of thirty or forty minutes, plaintiff was doing other work at the order of Carson. He returned to the machine and worked about it while Carson ran two or three batches of material through the mixer. As far as he knew, the machine appeared to be in good order while Carson operated it. Plaintiff then took over the operation of the machine. While operating it to raise the hopper to a position to empty the materials into the mixing drum, the brake, by which he attempted to hold the hopper load, refused to work, whereupon the hopper fell with great violence to the ground and caused cables on the machine to whip about, thereby destroying one of plaintiff's eyes and otherwise greatly injuring him about the head.

At the time of his injury, plaintiff was operating a machine known as a Kohring Concrete Mixer, Model S-10. He had operated that make of machine for a number of years and an identical model for a year or so, showing that he was an experienced employee. The machine was operated by a lever, which, when pushed forward, raised the hopper by means of the clutch to a position where it emptied or poured the material into the drum to mix into concrete. Pulled back, the lever acted upon and operated the brake. Midway between the push and the pull operations, the lever became neutral. When the hopper reached its highest vertical position, a kick-back dog engaged the brake and held the hopper until the material emptied into the drum. However, in order to keep the materials from spilling on the ground and wasting, plaintiff was ordered by Torson, which was also the customary procedure followed by him, to permit the hopper to come within six or eight inches of a vertical position, and then apply the brake. He used this method at this time. The machine had not been used for several days. Although Carson had run through several batches, plaintiff was injured while raising his first batch of material. The hopper contained about one-third of a load at the time it fell and injured plaintiff.

This machine was about a month old and had been run several times, parts of days. A witness testified that, until the brake-band lining of a new mixer becomes set, which generally requires three or four hours running, it has to be given more or less attention and adjusted, after which it will run steady with very little adjustment. On the morning of the plaintiff's injury, witness tested the machine and found the brake and the brake-bands working. He filled the

gas tank, the radiator with warm water, tested the oil, warmed up the machine, and raised and lowered the hopper, finally shutting down the machine, after finding it in satisfactory working order. He further testified that, after the injury, he found the hopper on the ground, and the hoisting cable in slack and disengaged from the shive. He replaced the cables and discovered that the brake would not work or hold the hopper. By tightening up the brake adjustment nuts, which required about five minutes, he adjusted the brake, whereupon the machine operated. The failure of the brake to hold would cause slack in the cable, causing it to disengage and whip around. The force would depend upon the speed and weight behind it. He observed blood on the cable. Another witness saw the hopper hit the ground and bounce two or three feet in the air, and observed the hoisting cable strike the plaintiff.

A batch or hopper load, which empties into the mixer drum, consists of two sacks of cement, two wheelbarrows of crushed rock, and gravel and water, weighing 1300 or 1400 pounds. As the hopper weighs about 400 pounds, the total weight of the hopper and load was at least 1700 pounds.

As defendant Carson was not present at the trial, plaintiff introduced in evidence his deposition. Carson testified that he ran two or three batches of concrete that morning, and that he ascertained by operating it that the brake had a tendency to slip a little bit, but nothing more than usual.

When the machine was in good working order, the loaded hopper could be held in any position between the ground and the vertical position by disengaging the clutch and engaging the brake.

This particular mixer, practically new, had been operated only a part of two or three days. Plaintiff operated it twice, for three or four hours each time. Carson directed plaintiff to prepare the mixer for operation that morning. He ascertained that the mixer was filled with gasoline and water and commenced to oil it when Carson said, "Ed, shut that ——— machine down. It is all right, we don't want to hear the noise." He tuned the mixer and put it in an operative condition the first time he saw it. The hopper was lowered to the ground by releasing the brake slightly, and will not lower with the brake on.

If the brake is in proper adjustment, it will hold the loaded hopper at any place from the ground to the unloading point. When the brake is properly adjusted, it does not slip when set.

We need not summarize defendants' evidence further than to state that it tends to show that the proper way to operate the hopper was to permit the clutch to pull it to its greatest height or vertical position until it struck the kick-back dog or automatic stop, which set the brake, thus holding the hopper and causing it to empty into the drum by gravity, after which to lower the empty hopper

by means of the brake; that the proper way to hold or lower a loaded hopper was by means of the clutch.

I. The sole determinative question, as presented by defendants' brief and argument, involves a submissible case made by plaintiff. They declare that the evidence fails to support the averments of negligence, and argue that the contentions, that the concrete mixer was of a kind or in a condition unusual to the industry, or that it was in a condition not common to all concrete mixers, were without foundation of fact. They summarize their position thus: "First, plaintiff failed to prove that the brake was defective or that the slipping of the brake was anything more than is usual and customary in the ordinary course of the operation of the machine; and, second, the plaintiff failed to prove there was any occasion to make repairs until after the accident had occurred and a portion of the cable had become unwound."

There appears to be no need to discuss the make or model of the machine, for the question of the suitability of the appliance is not involved. Plaintiff, as one phase of his theory of the right of recovery, presents that the brake of the mixer was not then in repair and was not in a proper and safe condition and shape to keep it from slipping and the hopper from falling.

The evidence sufficiently shows that the brake was temporarily defective and out of repair, thus permitting the hopper to fall and cause injury to plaintiff. This was shown not only by the falling of the hopper, but by the testimony of defendants' former employee that the brake would not hold the hopper, as was intended and customary, until he tightened, immediately subsequent to plaintiff's injury, the adjustment nuts affecting the brake. Defendants, however, cannot be held responsible for the failure of the brake to hold the hopper, under this theory of recovery, unless they had knowledge or notice of the brake's defective condition. That is to say, parties cannot be held responsible for an injury unless there is a showing of facts or circumstances from which negligence, or an inference thereof, may be deduced.

It is clear, we think, that a submissible case developed from the facts and circumstances in evidence. The evidence not only tended to show that the brake on this mixer would not slip when properly adjusted and set, but it also tended to show that, if the brake slipped, the hopper would fall or go down to the ground and cause the cable to run slack. It further tended to show, by the deposition of Carson, that Carson, immediately prior to plaintiff's injury and while operating the mixer, ascertained that the brake had tendency to slip a little bit. As Carson was the foreman of the copartnership, his knowledge of the condition of the brake was imputed to the Torsons. Thus the facts ascertained by Carson constituted

knowledge of the Torsons and notified them that the brake was possibly in a defective condition and temporarily out of repair. From this state of facts, an inference of negligence arose from the evidence and the question of defendants' negligence became an issue for the jury. The fact that the brake had a tendency to slip in connection with the fact that it would not slip when properly adjusted and set was notice to defendants of the brake's condition, thus requiring on their part the necessary attention and repair. Notwithstanding Carson stated that the brake, while he was operating the machine, did not slip more than usual, yet that it slipped at all, when viewed in conjunction with the purport of the evidence that the brake was not constructed or intended to slip, was notice to defendants that the brake was defective and required attention and adjustment. Thus charged with knowledge and notice, defendants were charged with the duty of attending and adjusting the brake, which they neglected to plaintiff's injury. The facts made a submissible case.

The judgment is affirmed. *Cooley* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur.